Good morning, Your Honors. My name is Ronald S. Barrick, and I represent Appellant ECC, the plaintiff in the underlying case. Cutting to the heart of this case, it is essentially about several mistakes of law made by the bankruptcy court as the trial court concerning California damages law. Specifically, the bankruptcy court ruled that in a breach of agreement to negotiate, only reliance damages can be recovered, quote, period. Could we talk for just a moment about an issue that proceeds that, at least logically? The contract said written notice to terminate. Yes. Oral notice to terminate, but not written notice to terminate was given. Is that correct? Oral notice was given, Your Honor, that they were stopping the project. They admitted on the record they didn't even give oral notice that they were attempting to terminate the agreement. I think the way the court put it as a defining fact was that everybody knew it was over. The trial court definitely said that. Now, after the case was reversed and remanded, partly on that ground, I think the bankruptcy court said it was that the written notice requirement was boilerplate, and that's why it didn't apply. It's true that the – Am I remembering that right so far? Yes. Okay. Now, here's – The bankruptcy court said that. Here's what confuses me. Yes. California contract law is really unusual. It's not like the contract law we learned at law school or that we have in Alaska. It's – what does boilerplate have to do with whether it's a binding contract? Is there some California legal principle about that? Nothing, Your Honor. I'm with you. I couldn't find a citation that said boilerplate isn't binding in California. No. I'm not aware of any. I've been practicing only 40 years, but I'm not aware of any either. About the same duration for me. So it's not some California principle. I don't know. No, Your Honor. It was the bankruptcy court's principle. Now, what is the problem on Copeland? I thought it was the law, even though in other places an agreement to agree or agreement to negotiate isn't a contract. I gather it is in California, but all you get is reliance damages. You get out-of-pockets, but you don't get expectancy. No, sir. That's not what Copeland says. There is – you are correct that there is a history of debate in a number of jurisdictions, including California, about agreements to agree on the one hand versus agreements to negotiate on the other hand. They're very different. We don't have an agreement to agree. We have an agreement to negotiate. Bankruptcy court ruled that. No issue about that. Agreements to negotiate in California were unclear at the time the Ninth Circuit decided the Vestar case in 2001. One year later, the California Court of Appeal decided the Copeland case, made perfectly clear that an agreement to negotiate in California is enforceable, may stand as a cause of action like any other breach of contract claim. I'm having some trouble with the language in Copeland that says, For obvious reasons, damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. The plaintiff cannot recover for lost expectation profits because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement. So the Court seems to make some pretty clear statements that, as Judge Kleinfeld mentioned, all you get is reliance damage. And I couldn't understand your argument as to why we shouldn't take that language just at its face. Because what the Court was saying in the language that you quote was the application of its understanding of the law to the facts of the case before it. Mr. Copeland. At least three times in the opinion, the Court said that for breach of an agreement to negotiate, you're only entitled to reliance damages. It said it as explicitly as it could, it seems to me. And now you say, well, that was just saying that in the facts of this case, all they're entitled to is reliance damages. I find it hard to read that opinion as restrictively as you do. Well, Your Honor, I read it as I do, not only because it serves ECC's interests, but because I think when you read the case in its entirety and all of the cites that that Court made to Professor Farnsworth's article, also cited by the Ninth Circuit the year before in the Vestar case, what they are saying is generally you can only recover reliance damages because under California Civil Code Section 3301, you wouldn't have reasonable certainty as a general proposition of what damages might exist. In a general agreement to negotiate, you have no starting point. You have nothing at all. Just a promise to negotiate, which may or may not lead somewhere. In Vestar, that was clearly the case.  Both of those cases cite to Professor Farnsworth for the proposition that in appropriate circumstances, expectation damages would also be recoverable. I don't understand why that matters. I mean, the way a court writes an opinion, it sets out the law and it has a citation ordinarily in support of the proposition urged. But that doesn't mean, particularly with an academic source like that, that you then switch to that professor and he's the lawmaker and anything else he says is the law, even though the court didn't say it. It's not a matter of saying that Professor Farnsworth constitutes law. I'm not saying that. What he constitutes is reason. And with the Vestar and Copeland citations of Professor Farnsworth, I think the appropriate test here is what would this panel conclude that the California course would do if presented with the facts in the ECC case? And I think there is indication there that what the California course would do is what we argue. Our case is quite different than Vestar or Copeland in that we had a starting point. We had many of the terms in place. We had an objective standard by which the remaining terms were to be pinned down. It wasn't maybe we'll do it, maybe we won't. There was an agreement to do it in accordance with an objective standard. I can see how you might have an argument that the contract incorporates the terms of the license that were put in there as what you were going to negotiate. But didn't you waive that argument? You didn't raise that to us. We're only looking at damages. So the question about breach of the definitive terms of the license is now gone? No. The issue here is the judge said, the bankruptcy court said we had no proper damages that we could assert. We say we do. But the only breach we're looking at is breach of the duty to negotiate. And I guess in my view, Copeland couldn't be more clear. Here's another quote. As we explained, reliance damages are the only form of recovery available and in action on a contract to negotiate an agreement. So to the extent that the only breach is breach of the duty to negotiate, I think Copeland couldn't be more clear. I'm having trouble understanding how we get around that language. Well, it is for the reason I'm saying. Copeland is saying generally reliance damages are all that are available because generally you don't have any information on which to find and calculate damages. In our contract, we do. We have the objective standard. Even the bankruptcy court, Your Honor, admitted that some of our damages were appropriate even under its test or the one you're hypothecating to me. As I understand what you're saying is that despite the broad language that we've referred to in Copeland, if that court had this case before it, it would come out the other way and would say in this case you can get something more than reliance damages. Is that right? Absolutely. Absolutely. And beyond that, Your Honor, the bankruptcy court said that reliance damages means only, only costs of negotiating the contract in question. Well, I didn't say that. What it said was that that was an example of the kind of thing that reliance damages. I don't read it as saying that that's all you can get of the cost of negotiating. Oh, no, no. I agree with you. There's no question that the court did not limit, the published opinion did not limit reliance damages to costs of negotiation. Copeland makes that clear and Vestar makes that clear. It is the bankruptcy court that said no, reliance damages are just costs of negotiation. And he said most of your damages don't fit. Therefore, I'm throwing your Phase II damage trial out. But what about the damages that by the bankruptcy court's statement he admitted did fall within his standard, which based on what you just said, I agree, is narrower than what the courts have said. He still threw out the Phase II case and didn't let us try the damages that he said did fit within his, I argue, narrow definition of reliance damages. But what are the damages you say that you're entitled to? Lost profits? Pardon? What are the damages that you say you're entitled to under what you claim is even the courts have said? Well, as an example. Lost profits? As an example. I do believe under our circumstances Copeland, the reasoning of Copeland, the reasoning of Vestar. Just a simple answer. Do you think that the reliance damages you're entitled to includes lost profits that you would have made had the venture gone through? I do believe the answer to that is yes on all facts. Why aren't those expectation damages? Well, as Professor Farnsworth makes... Never mind Professor Farnsworth. We're not bound by Professor Farnsworth. No, of course not. Why? It seems to me that's the classic expectation damages. I had a contract. The contract was brief. If the contract had been performed, I'd have made $6 million. Therefore, I'm entitled to $6 million. That's not reliance damages. It's expectation damages. It's expectation damages, Your Honor, when you're talking about recovering that from a third party under a new agreement. When you're talking about recovering it from the very defendant under the agreement in the case, that is reliance damage. I relied on entering into this contract because Malincroft told us we would recover and make the projections of profit that they gave us. If you're talking about it in the context of what Malincroft was going to earn for us under the contract in question, that's reliance damages. We relied on their projections in entering into the contract. If we're saying, oh, no, if you hadn't tied us up by telling us you're stopping but not freeing up our good title, we could have gone out to a third party and done the same kind of thing. That's an expectation damage. I think you're talking about lost opportunity rather than expectation there. They very much overlap. I agree, Your Honor. But there are clearly, even if you want to stay to the... If I only have one elephant to sell and I have a contract to sell the elephant to you, until you let me out of the contract, I can't sell it to the zoo. That's right. That's right. That's a lost opportunity to make a profit that is an expectation damage. But if we're also saying, as we are in this case... Well, it's a little different. It's a little different. If I have one elephant to sell to you, my expectancy damage is the profit I would have made selling the elephant to you. That's your reliance damage. That's you relying... Reliance damage is taking care of the elephant until you take him off my hands. You entered into the contract with me to sell me an elephant in reliance on my promise. I've got to hire people to give the elephant hay and water and shovel and all that stuff. And that's my reliance. No, that's an example of reliance, but it's not the only reliance. You entered into the contract to sell me your elephant because I promised I would pay you a certain amount of money for it. Maybe the amount of money was I'd put your elephant out into the shows and sell tickets and give you a share of it. I understand what you're saying. You relied there. But you also got tied up. I wouldn't let you out of your deal so you couldn't sell the elephant to the guy down the street. That's a lost profit that is an expectation damage. They happen to be very parallel. I understand what you're saying now. And before your time runs out, I've got one more question that I need to know. Sure. Let's say I read Gilmore your way. There's no waiver here of the agreement that communications have to be in writing and a termination has to be in writing. What does it matter? How does it affect this case in practical terms if it was not properly terminated by the oral notice? Then the agreement lasted much longer. It wasn't terminated until we asked to have it terminated two years later in the trial of the bankruptcy court, and therefore our damages wouldn't be measured as of the earlier oral alleged termination rather than the later. How would that affect the character of the damages? Your Honor, I don't believe it would affect the character, but I do believe it would affect the magnitude. So it's not a dollar difference? So the question of whether the contract was terminated earlier or later relates only to the dollar amount of the damages as distinguished from whether these were permissible damages at all? You know, in the objective sense of the word, yes, Your Honor, I think that's correct. In the subjective sense of the word, another difference between our case and these other cases, if you look at Copeland, Baskin and Robbins, the defendant there, acted very quickly in writing to tell Copeland, go away. Hold on. Stick with this question. I just heard two things that were in conflict with each other, and I need to straighten them out. Yes. Suppose you win on the notice issue. Yes. How many dollars more do you get, and what are the dollars for? The amount of dollars we get are more, and they are covered both by reference to Malincroft's projections given to us. In the record. Wait a minute. I'm getting lost. Okay. You get more dollars. How many more dollars, and what are the dollars for? The dollars are for the same kinds of breaches, just working those wrongs on us, such as tying this up. Just talk concretely. How many dollars? Your Honor, I don't have the dollar amount in my mind, but it's in Dr. Getty's declaration testimony in the record that was before the bankruptcy court, which it refused to consider. Well, let's look at it a little differently. Is it your contention that you lost more money, that you lost greater profits because of the two-year delay? For sure, because they continued not to release our technology, not to lift the cloud off of our technology. Orally, they're telling us the agreement is over or the project is over, but the truth of the matter is we couldn't go out into the marketplace and try and market our technology elsewhere, because anybody that would look at the agreement we had with Malincroft says, you had to have written notice here to end this. Where's your written notice? Did you have evidence that somebody else was ready to buy the technology? We had negotiations and discussions and never could get past the point of, where's your written termination from Malincroft? And when we said we didn't have any, they would say, come back and see us when you do. And you say that these distinctions that you're urging are accepted by California? I believe so. I believe a careful reading of both Vestar and Copeland make that clear. If you read the Toymakers case that we've also cited, the plaintiff won there, and it got damages, and it got damages based on the rationale of Copeland, even though Copeland turned down the plaintiff. Toymakers decided and awarded damages to the plaintiff, and I sincerely believe that if these facts were being heard by a California court today, looking at Copeland and looking at Toymakers and looking at the California Supreme Court decision in Lewis George in 2005, that damages would be awarded, both reliance damages broader than the bankruptcy court considered to be eligible reliance damages, and even expectation damages as well. Thank you, Counsel. Thank you very much. Good morning, Your Honors. Richard Nakamura on behalf of Appellees Malincroft and Nalicor Puertan-Bennett. I would like to bring some clarity to the colloquy that just occurred as to the different types of damages, the differences between expectation and reliance. And as we did in our brief, we broke out, specifically with dollar amounts, the number and the nature of each of the types of damages that ECC was claiming, Judge Friedman, to your question, what are the expectation damages and what are the reliance damages. The expectation damages, by ECC's own experts' characterization, were contingent royalties in the amount of approximately $47 million and the royalty guarantee difference in an amount of approximately $35.7 million. Now, as I said, ECC's own expert at pages 304 and 305 of the excerpts of record characterized those as expectation damages. Under Copeland, which is the controlling law in this case, those damages are not recoverable. The analysis for expectation damages need not go any further than the testimony of ECC's own expert on that. Turning to reliance damages, Judge Friedman, the reliance damages, as described by ECC's expert, were as follows. The value of our so-called competing patents in an amount of $47.8 million and the ordinary guaranteed fee in the amount of $24.2 million. Now, as to those two categories of damages, the ordinary guaranteed fee and the value of the competing patents, in Phase I, Judge Russell ruled that ECC was not entitled to a guaranteed fee other than the $100,000 in consultant fees that Mallicrott paid over the life of the agreement. That issue, Judge Ikuda, as you pointed out, is not in play on this appeal, because the only issue on this appeal has to do with damages. And if you look at the statement of issues in ECC's opening brief, their third issue does address contractual interpretation, but only has to do with the question of termination. Whether or not, yes. Kennedy. Counsel, let me ask you a question about that. Please. There aren't just two categories under Copeland. Copeland says that this measure, that means the measure of damages, encompasses the plaintiff's out-of-pocket costs in conducting the negotiations and may or may not include lost opportunity costs. The plaintiff cannot recover for lost expectations, profits, because there's no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement. Then you look down at the footnote and the court says, because Copeland cannot establish lost opportunity costs in this case, we need not decide whether in principle such damages are recoverable. So there's a category where they haven't decided one way or the other. That's these lost opportunity costs. Now, in this case, the argument by ECC is that there were lost opportunity costs and they were considerable, because you wouldn't give them written notice. They weren't let off the hook on their obligation to let Malacroft use the technology, so they couldn't license it or otherwise get money from it from somebody else. And that looks like it would be not expectancy damages in the categories that Copeland lays out, but lost opportunities. What are the lost, what's the evidence on lost opportunity damages here? Thank you for the question, Judge Kleinfeld. If the Court would look at page 80 of the excerpts of record, there is a very pointed exchange between the Bankruptcy Court and ECC's trial counsel on this very question. If the Court will indulge me just a few seconds of reading from this exchange that occurred below. Judge Russell, the Court. Let me ask you a good point to really get to the heart of this. Where is the evidence that there were these opportunities? People were ready, excuse me, ready, willing, and you didn't go into those specific  Do you have any evidence of that response? We do not have a specific party X, hired party X, or third party Y who was prepared to enter into an agreement. At page 82 of the record, the Court continues, excuse me, page 81. Counsel for ECC says, do we have a party X that I say would have signed up for that? No, we don't. That's what I said we don't have. That's at two excerpts of record, page 81. Now, as as But was there an indication that the reason they didn't have party X ready to sign up was because they hadn't been released from their commitment? There may be some validity to that argument, but for the finding, which was not clearly erroneous, that as of 2001, everybody knew that the project and the agreement were over. So there was nothing that we were doing or nothing that should have impeded ECC. You say everybody knew the project was over, yet I might feel before entering into it that I wanted to be sure that there had been a written termination. Otherwise, perhaps if I entered into a deal with you people, I might be then sued by someone saying, wait a minute, he had no authority at that point to enter into this commitment. But the purpose of the written termination clause as construed by Judge Russell was simply to give notice. And there was no question, and I believe it is fair to characterize this as a factual finding by the Bankruptcy Court, that everybody knew by April of 2001 I thought the finding and the conclusion made no sense in light of the law. That one case on this, Gilmore, says the requirement of a written notice can be waived, but it never was waived here. In this case, ECC said, give us written notice, and Mallinckrodt refused. That can often be tricky, because what can happen then is the party thinks the contract is over, but the opposite party that refuses to give written notice can always pop up again and say, oh, we have a deal. That means if, say, another drug company is negotiating with ECC, and all of a sudden this failed oxygen pack turns into a success, Mallinckrodt can sue the other drug company for interfering with advantageous contractual relationships. If I were a lawyer for another drug company, I'd tell them, look, until there's written termination of that deal, you better not even talk to ECC. You're just exposing yourself. So it seems to me that here there's a refusal to give written notice. Written notice is required by the contract. The legal reason that the bankruptcy court gives for disregarding written notice is that everybody knew the project was over, but that's not a legal reason. Saying it's boilerplate isn't a legal reason. It looks to me as though it just, Mallinckrodt was still contractually bound and ECC was still contractually bound because there hadn't been written notice. And I'm trying to figure out how that matters. Tell me why I'm wrong about the written notice and why it doesn't matter if I'm right. Because the written notice goes to the possibility that Mallinckrodt may have a claim in ECC's two patents. That's what that's all about. And to the extent that there was no formal written notice terminating the agreement, at the conclusion of this case, Mallinckrodt expressly relinquished in the judgment any interest that it had in ECC's two patents. So there is very much. What date is that? It's in the judgment at the end of, I believe. So the judgment is the written notice. Well, the judgment contains Mallinckrodt's disclaimer of any interest in ECC's two patents, and it delineates the numbers of those patents. But again, for purposes of damages, it simply doesn't matter, because there are no recoverable damages, regardless of what the termination date might be. Remember, the purpose of ECC's argument in trying to move the termination date forward to the end of the trial is simply to increase its damages claims, because its expert admitted that if the contract ended in 2001, it essentially has no damages, certainly no contingent royalties, and that admission can be found. I don't see any problem, frankly, with extending the date until they get written notice, because that's the deal. I'm more interested in whether it matters. Well, again, for purposes of the dollars that are involved in this case, our position is it doesn't matter. And there is a writing that effectively ends the agreement, and that is the judgment. Your position basically is that the extension of the contract term doesn't matter because, under any theory, there's no damages available anyhow, because what they're seeking is something other than reliance damages. I would agree, Judge Friedman. And if they're not entitled to a particular type of damages, it doesn't matter for what period they are or are not entitled to it. I would agree, Judge Friedman. That's your basic theory. Yes. Well, was there evidence that I think ECC was characterizing it as a cloud on the title that this ongoing contractual relationship was a cloud that prevented them from having fruitful or productive negotiations with other parties that might be interested? What sort of evidence was presented on that? None, because that — thank you, Judge Akuda. The cloud on title theory was part of the slander of title cause of action, which ECC unsuccessfully sought leave to amend on in Phase I. That went up to Judge Baird on the prior appeal. It was affirmed, and it's not even in play on this appeal. That cloud of title is a nonissue as we speak today. Well, but with respect to damages, if in fact the contract didn't terminate until some subsequent time, did ECC present evidence of attempts to negotiate that were foiled by the fact of the contract not being terminated? No. None whatsoever. In fact, the colloquy that I read to the Court earlier in many respects tells you that there were no lost opportunities. They had no such evidence, Judge Akuda. And unless the Court has further questions, I submit. Thank you, counsel. Thank you. Go ahead and take one minute. Thank you. Just to clarify on a couple of points and questions that were asked, opposing counsel read from a portion of Dr. Getty's declaration testimony about damages. He read what he had to say about exception damages, expectation damages. He overlooked, conveniently, the portions of his declaration that talk about reliance damages. There are both. They are, as Your Honors pointed out, some overlap with lost profits, reliance versus expectation, and particularly lost opportunity costs. They're there. And they are there in our case. Where do we look for them? In Dr. Getty's declaration. It's in the record there. Also, finally, you asked opposing counsel whether there was any evidence of the Cloudon title. Indeed, there was. And it's in the record. And indeed, opposing counsel cited to you the excerpts at pages 80 and 81 the whole colloquy that that trial counsel had with the bankruptcy court. And for the record, I was the trial counsel. I was there. That colloquy all had to do with how can we present to you when your own wrongdoing stops us from getting to a point where we have a definitive offer from a third party to step in when the third party takes one look at this contract and, like Your Honors has said, says, whoa, come back when you've got a written sign-off. The written sign-off that opposing counsel says was presented was two years later in the judgment in phase one of the trial. For two years, we had a record of trying to get them to say in writing, we're free, go find somebody else, and they wouldn't do it. And we'll find the evidence of foiled negotiations in Dr. Getty's declaration or somewhere else in the record? You will find in his declaration. It isn't somewhere else. It is basically in his declaration. He talks about using Malincroft's very projections to us. And he talks about the market conditions as he studied them. He's a Ph.D. in economics and has the credentials. They were never disputed. He talks about what would have happened in the marketplace based on his research if we had not had the cloud on our title. Thank you, counsel. Thank you very much. Thank you. ECC versus Malincroft is submitted. Do you want to recess before the case? Pardon? Do you want to recess before this overtime case? No. Do you want to recess, Sam? I. Now we'll hear Desty versus Bair, and this is consolidated with Barnack and Menace for argument. There are three different cases, different parties, but we've consolidated them because the same issue is raised in all of them. I assume counsel has figured out how they're going to divvy up the 30 minutes per side. We have not. Just tell the clerk, and that's how the clock will run. Would you like us to do that now or when we start our argument? Why don't you do it now for convenience of the clerk. I'm going to go first on Michael Banks. Why does counsel all take approximately 17 minutes plus or minus? Ms. Butler, you'll take approximately eight minutes again plus or minus Mr. Peterson's file. Thank you, Your Honor. Okay, and that's on the defense side. Yes. Now what about the plaintiff's side? On the plaintiff's side, Matthew, break her off. I'm taking the full 30 minutes. Thank you.
judges: Kleinfeld, Ikuta, Friedman